UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

IN THE MATTER OF THE  CASE NO. 6: 18-mj-00010

EXTRADITION OF

MARIUS ANDREI PORUMB  MAGISTRATE JUDGE HANNA

**<u>MEMORANDUM ORDER OF RELEASE PENDING CERTIFICATION OF EXTRADITION</u>**

Currently pending before the Court is Marius Andrei Porumb's request for bond pending certification of a request for extradition by the government of Romania. Porumb, who is in this country by virtue of asylum having been granted by the United States over fifteen years ago, was arrested on January 30, 2018 pursuant to a warrant based on a criminal complaint that he was an alleged fugitive from a foreign country to the United States under 18 U.S.C. § 3184.[1] The Government, in fulfilling its treaty obligations to Romania, seeks certification of Romania's request for extradition. A detention hearing was held on February 6, 2018, at which Porumb presented evidence in the form of exhibits and witness testimony. Prior to the detention hearing, the Government admitted its evidence in support of certification that was also previously filed in the record as part of the affidavit in support of the

---

[1] Rec. Doc. 1.

1

complaint and arrest warrant.[2] Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, this Court finds that Porumb's request for bond shall be granted and conditions of release shall be set.

## **FINDINGS OF FACT**

According to the affidavit and exhibits submitted in support of the complaint by the government of Romania, on June 23, 2003 Porumb was indicted and ultimately convicted in absentia of: (1) use of false documents, in violation of Article 291 of the Romanian Penal Code, (2) swindle, in violation of Article 215 of the Romanian Penal Code, and (3) two offenses in violation of Article 31, indirect participation in a forgery (Article 289 of the Romanian Penal Code) and indirect participation in a forgery of a document under private signature (Article 290 of the Romanian Penal Code).[3] The sentence originally imposed was appealed and, in the court's decision rendered on October 11, 2005, Porumb was sentenced to 4 years in prison.[4]

The United States and Romania have an extradition treaty dating back to 2007.[5]

---

[2] Rec. Docs. 1-2, 1-3.

[3] Rec. Doc. 1-1.

[4] Rec. Doc. 1-2, pp. 83-93.

[5] Rec. Doc. 1-3.

Article 6 of the treaty states, "[E]xtradition may be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State."[6]

Article 126 of the Romanian Penal Code provides the limitation terms relating to penalty executions. The portion of the article applicable to Porumb's penalty provides a statute of limitations of "5 years, plus the penalty to be executed, but no more than 15 years, for the other imprisonment penalties." Porumb contends that his extradition may be denied because the statute of limitations has lapsed. The Government contends that the statute of limitations has not lapsed because Article 127 of the Romanian Penal Code interrupts the time limits established by Article 126. That statute provides that "[T]he course of the limitation term provided in Article 126 is interrupted by the cessation of the penalty's execution or by a perpetration of a new crime." The Government contends that Porumb's presence in the United States caused a cessation of the penalty's execution.

The conduct supporting the charges contained in the indictment is alleged to have occurred during the spring and summer of 2000.[7] None of the conduct involved

---

[6] Rec. Doc. 1-3.

[7] Rec. Doc. 1-2, pp. 54-57.

3

violence. Rather, while his wife was out of the country, Porumb allegedly submitted documents which contained her forged signature to a lender in order to utilize an apartment that was allegedly her separate property as collateral to obtain a loan which he did not repay. The initial loan was for 13,200 German Marks (DEM) but was negotiated down to 9,000 DEM.[8] His wife, from whom he has since been divorced, did not know of or consent to the transaction. She learned of it in September of 2001 when she discovered a mortgage on the apartment in the Land Register abstract.[9]

According to Porumb's affidavit submitted in support of his request for asylum in the United States, he left Romania on August 5, 2001 and arrived in the United States on August 6, 2001 on a B1/B2 visa.[10] On August 2, 2002, Porumb applied for asylum in the United States.[11] Following his interview with the INS Asylum Officer, Porumb was instructed to "furnish proof of death or legal termination of marriage of documents filed for divorce (sic)."[12] Those documents indicate that, on either October 20 or 29th of 2001, a divorce proceeding was held and in addition to dissolution of the marriage, Prumb's wife "wants to be find (sic) that the flat obtained

---

[8] Rec. Doc. 1-1.

[9] Rec. Doc. 1-2, p. 103.

[10] Def. Ex. 1, pp. 24-26.

[11] Def. Exh. 1, p. 49.

[12] Def. Exh. 1, p. 9.

4

white (sic) they were together remains to the claimer so that the tabulation of the flat in the surveyor's register is imposed. The claimer is the only owner of this flat." [13] The documents indicate the divorce was rendered on October 29, 2001.[14]

On October 30, 2001, Porumb's wife provided a statement that initiated Porumb's prosecution in which she indicated that she had not seen Porumb since December of 2000, did not know his whereabouts, and "in October of 2001 our divorce was pronounced, as well as the partition, according to which the apartment has been awarded to me entirely."[15]

Porumb's asylum request was based on race, nationality, membership in a particular social group, and Torture Convention.[16] A declaration in support of Porumb's application for asylum indicates that he faced discrimination and persecution in Romania because of his status as a Gypsy.[17] In the declaration, Porumb asserts that his problems with the Romanian police began when he changed businesses and started to buy and sell cars.[18]

---

[13] Def. Exh. 1, p. 52.

[14] Rec. Doc. 1-2, p. 53.

[15] Rec. Doc. 1-2, p. 104.

[16] Def. Exh. 1, p.15.

[17] Def. Exh. 1, p. 20.

[18] Def. Exh. 1, p. 23.

5

Porumb states that he was stopped in 1997 by the Romanian police for a random screening because the police thought he looked dangerous. As a result of this stop, a report was issued that Porumb was speeding, and his driver's license was taken away.[19] In November 1998, Porumb was accused of driving while under the influence, but the Romanian police refused to take him to the hospital to determine his blood alcohol level and claimed that he would receive "greater problems" if he insisted on going.[20] From March 1999 until February 2000, Porumb was called into the Romanian police station about once a month.[21] Porumb states that, duing this time period, he was interrogated about his business dealings and transactions because the Romanian police believed that Gypsies did not have the authorization to buy and sell.[22] In January 2000, Porumb was accused of selling a stolen Mercedes and was threatened, but not detained. Based on these interactions, Porumb stated,

> "On account of my Gypsy identity, I had been interrogated, verbally abused, detained, and threatened on numerous occasions. I was afraid that the police would eventually stay true to their word and accuse me in a false case. In Romania, 'innocent until proven guilt' does not exist. If I return to Romania, the police could arrest me again, fabricate

---

[19] Def. Exh. 1, p. 23.

[20] Def. Exh. 1, p. 23.

[21] Def. Exh. 1, p.23.

[22] Def. Exh. 1, p.24.

evidence against me, and imprison me for life."[23]

On September 23, 2002, Porumb was granted asylum in the United States.[24] According to the evidence adduced at the detention hearing through the testimony of four witnesses, Porumb has lived openly under his given name in the local area since 2001. He currently lives in Lafayette with his fiancée and their two young children. He owns and operates a car repair business and has maintained employment since he arrived here. His Romanian passport expired and he has made no effort to obtain a new one. There is no evidence that Porumb has left the country since he arrived or that he has left Louisiana for an extended period of time. He has strong ties to the community. He is regarded by the witnesses who testified, credibly, as an honest person of good moral character who sometimes provided his car repair services at no charge. This is further evidenced by the fact that a non-family member is willing to act as a surety on a two hundred fifty thousand dollar bond. There is no evidence of any kind that he has ever been in any type of trouble with law enforcement or engaged in any acts of violence since he has been in the United States.

The Government argues that Porumb is a flight risk because he avoided prosecution. However, there is no evidence that Porumb was aware of the charges

---

[23] Def. Exh. 1, p.24.

[24] Def. Exh. 1, p.5.

and/or conviction in Romania. To the contrary, the Romanian indictment was issued long after Porumb was in the United States and long after he received asylum status.

## CONCLUSIONS OF LAW

### A. Applicable Standard for Release on Bond

The current proceeding is an administrative proceeding arising under international law for certification and approval of the State Department's decision to extradite Porumb at the request of the Romanian Government.[25] However, the federal extradition statute provides no explicit authority for a district court to grant bail to a potential extraditee.[26] The Bail Reform Act also does not apply because extradition cases are not criminal in nature.[27] Rather, the determination of whether an extraditee shall be released or detained is governed by federal jurisprudence.[28]

In *Wright v. Henkel*, the Supreme Court recognized that a court has the power to grant bail in international extradition cases.[29] The Court ruled that "while bail

---

[25] See 18 U.S.C. § 3184.

[26] See 18 U.S.C. § 3184.

[27] *In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 735 (W.D. La. 1999) citing *Kamrin v. U.S.*, 725 F.2d 1225, 1227-1228 (9th Cir.1984).

[28] *In re Extradition of Gonzalez*, 52 F.Supp.2d 725, 735 (W.D. La. 1999), citing *In Re Extradition of Mainero*, 950 F.Supp. 290, 293 (S.D.Cal.1996).

[29] *Wright v. Henkel*, 190 U.S. 40, 63 (1903).

8

should not ordinarily be granted in cases of foreign extradition," the Court was unwilling to hold that courts "may not in any case, and whatever the special circumstances, extend the relief."[30] Based on this decision, courts have applied the "special circumstances" test for bail determinations in extradition cases.[31]

Under this standard, the detainee must establish a special circumstance by clear and convincing evidence and must also show that he will not flee or pose a danger to any other person or to the community.[32] "Special circumstances must be extraordinary and not factors applicable to all defendants facing extradition."[33] This means that a court is not limited to previous decisions where special circumstances have been established. Rather, "the decision to grant bail and consequently, the determination of what constitutes a special circumstance, is left to the sound discretion of the trial judge."[34]

**1. No evidence that Porumb is a danger to the community or a flight risk**

Based on this Court's review of the record and the testimony at the hearing,

---

[30] *Wright*, 190 U.S. at 63.

[31] *Jimenez v. Aristiguieta*, 314 F.2d 649, 653 (5th Cir. 1963); *In re Extradition of Russel,* 805 F.2d 1215, 1216 (5th Cir. 1986); *U.S. v. Kin Hong*, 83 F.3d 523, 524 (1st Cir. 1996); *Kamrin v. U.S.,* 725 F.2d 1225, 1228 (9th Cir. 1984);

[32] *In re Extradition of Gonzalez*, 52 F.Supp.2d at 735.

[33] *In re Extradition of Gonzalez*, 52 F.Supp.2d at 735.

[34] *In re Extradition of Gonzalez*, 52 F.Supp.2d at 735.

there is no evidence whatsoever that Porumb is a danger to any other person or the community. The crimes that he is accused of committing 17 years ago were not crimes of violence and there is not a scintilla of evidence that he has ever been in trouble with law enforcement since he arrived here or that he has any history of violence. The Court thus concludes that Porumb has shown by clear and convincing evidence that he is not a danger to the community.

Likewise, the Court readily recognizes that the Bail Reform Act does not apply to this detention decision. However, that does not foreclose this Court relying on the factors contained therein to determine whether Porumb is a flight risk. All of the factual findings set forth above, and in particular the credible testimony of the four witnesses, demonstrate by clear and convincing evidence that he is not a flight risk. Further, this Court can fashion conditions of his release that will reasonably assure his appearance. Therefore, this Court finds that Porumb has met his burden to show that he is not a flight risk.

**2. Special Circumstances are Present**

At the certification hearing, Porumb challenged two of the requirements necessary for certification: the crimes for which surrender is requested are covered by the treaty and there is sufficient evidence to support a finding of probable cause as to each charge. The Government counters that no probable cause determination is

required because he was already convicted albeit in absentia. Assuming without deciding the Government's position as to the second requirement is correct, the Court is of the opinion that Porumb has demonstrated special circumstances exist.

During the certification hearing, the Government submitted exhibits and Porumb requested additional time to brief potential defenses to extradition that he contends are part of this Court's certification process. Porumb contends that Romania's statute of limitations and his asylum status may prevent his extradition and that the Court has the authority to address these issues at the certification stage of his extradition proceedings. Porumb reasserted these arguments during the detention hearing. He contends that these potential defenses are considered a special circumstance such that bond should be granted because he has a substantial likelihood of success on the merits at the certification phase of his extradition proceedings.

Porumb's argument is supported by a previous ruling from this Court. In the case of *In re Extradition of Gonzales*, the magistrate judge held that a special circumstance was present because the detainee demonstrated that he had a substantial likelihood of success on the merits at his extradition hearing.[35] That decision was affirmed by the district court with the added condition of electronic monitoring. In a similar factual case, the *Gonzales* decision was recognized but not applied because

---

[35] *In re Extradition of Gonzalez*, 52 F.Supp.2d at 728.

11

a ruling on the certification hearing had already been issued and, as a result, the detainee's bail arguments were moot based on that court's interpretation of 18 U.S.C. § 1384. [36] However, in this case a certification ruling has not been issued and Porumb's arguments establish a substantial likelihood of success on the merits.

Porumb's first argument is that the crimes that he was charged with and convicted of are not covered by the treaty based on a statute of limitations defense. The potential statute of limitation defense is based on a plain reading of the treaty and the applicable Romanian Penal Codes. Article 6 of the treaty states, "extradition *may* be denied if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State. Acts that would interrupt or suspend the prescriptive period in the Requesting State are to be given effect by the Requested State."[37]

The Government has briefed this issue and contends that consideration of what they contend is a discretionary defense is outside of a district court's authority for certification and must be decided by the Secretary of State. Porumb will also be given the opportunity to brief this issue before a ruling for certification is issued. Therefore, at this time the statute of limitations defense remains undecided as to whether this

---

[36] See *In re Extradition of Mironescu*, 296 F.Supp.2d 632, 634 (M.D. N.C. 2003).

[37] Rec. Doc. 1-3.

Court has the authority to address the issue in a certification ruling. If so, there is a substantial legal question concerning whether the interruption provisions of the Romanian Penal Code are applicable as it is beyond dispute that more than nine years have elapsed since Porumb was sentenced.

Porumb's second argument is that he should be granted bail based on his asylum status. Porumb's asylum status presents a unique issue not applicable to all persons facing extradition. It is particularly extraordinary because he was granted asylum based on his previous and future fear of persecution and false prosecution by police long before he was indicted and convicted in absentia. Readily recognizing the difference between removal and extradition as a matter of policy, immigration law provides that an alien granted asylum shall not be removed or returned to their country of nationality.[38] The Court is aware of precedent addressing that statute, however, its relationship, or lack thereof, to the extradition issue is also to be briefed by the parties.

The Court is also aware of the "rule of non-inquiry" in extradition law particularly as it relates to whether the Secretary of State should make the sole determination of whether an extraditee will be treated humanely.[39] While the Court

---

[38] 8 U.S.C. § 1158

[39] See the discussion in *Mironescu v. Costner,* 480 F.3d 664, 668-669 (4th Cir. 2007).

recognizes it may lack authority to consider such issues under the Foreign Affairs Reform and Restructuring Act (FARR), it has been held that the rule of non-inquiry does not bar habeas review of the Secretary's extradition decision.[40]

Accordingly, this Court finds that Porumb's asylum status and his potential statute of limitation defense, whether considered individually or collectively, create a special circumstance in support of his release on bond until these issues are resolved by the Court. If it is within the Court's province to resolve these issues, Porumb has a substantial likelihood of success on the merits at the certification phase of his extradition proceedings. If these issues are properly left to the executive branch, the Court has also ordered briefing on whether bond is available after certification on the same grounds in light of the language in § 3184 given the likelihood of success on the merits at the next stage of the extradition process following certification, whether by the Secretary of State or on habeas review if necessary.[41]

---

[40] *Id.,* 480 F.3d at 673.

[41] Notwithstanding the language of §3184, it defies logic that a detainee should be prevented from establishing a special circumstance for release because he demonstrates a substantial likelihood of success in the extradition proceedings, even though those issues may not be decided by the court initially. This Court recognizes that the Secretary of State has more authority than a district court when deciding manners of extradition, which includes, but is not limited to "reviewing de novo the judge's findings of fact and conclusions of law, refusing extradition on a number of discretionary grounds, including humanitarian and foreign policy considerations, granting extradition with conditions, and using diplomacy to obtain fair treatment for the fugitive."*Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007) citing *U.S. v. Kon-Hong*, 110 F.3d 103, 109-110 (1st Cir. 1997).

## **CONCLUSION**

Based on the evidence presented, this Court finds that Porumb has met his burden to be released on bond because he has shown by clear and convincing evidence that special circumstances are present, and he is not a flight risk or a danger to the community. Accordingly:

IT IS ORDERED that Porumb be released UNTIL THE CERTIFICATION IS RESOLVED, on a $250,000 unsecured bond with a surety and with conditions that include: (1) he must report to Pretrial Services on the date of his release for supervision, (2) he cannot obtain a passport or international travel document, (3) his travel is restricted to Louisiana unless permission is obtained from Pretrial Services, and (4) he must be monitored by GPS at his cost. However, this Court's order will be stayed pending a decision from the assigned district judge if the Government chooses to appeal this ruling. Notice of that appeal, if desired by the Government, is to be provided no later than Wednesday, February 15, 2018.

Signed at Lafayette, Louisiana on this 9th day of February 2018.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE